IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KOCH INDUSTRIES, INC. AND
SUBSIDIARIES,

                    Plaintiff,

          vs.                                    Case No. 06-1049-JTM

UNITED STATES OF AMERICA,

                    Defendant.

## MEMORANDUM AND ORDER

This is an action by Koch Industries, Inc. and its subsidiary companies seeking to determine whether it may properly report its income from a New Mexico highway project pursuant to the percentage of completion method (PCM) authorized by 26 U.S.C. § 460, IRC § 460.  The defendant United States contends that PCM may not be used for any of Koch's income from the project.  Both Koch and the United States have moved for summary judgment on the issue.  In addition, Koch has moved to strike certain exhibits in the government's Response to its Motion for Summary Judgment.  For the reasons that follow, the court grants plaintiff's summary judgment motion.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Koch Industries, Inc. is a corporation organized under the laws of the state of Kansas. Koch filed consolidated federal income tax returns on behalf of itself and its affiliated group of corporations. Mesa PDC ("Mesa"), a single-member limited liability company, is an indirect subsidiary of Koch, and filed as part of Koch's federal income tax returns.

In 1998, Mesa entered into an "Agreement for Corridor 44 Professional Services and Warranty" with the New Mexico State Highway Transportation Department ("SHTD") relating to the expansion of a roadway in New Mexico known as State Route (SR) 44 or US 550.

On its consolidated federal income tax returns, Koch treated all of the income it received during the years 1998 through 2001 under the Agreement as income from a long-term contract under Internal Revenue Code (IRC) Section 460.

2

Koch, which had been in the business of producing asphalt for many years, was looking for opportunities to expand to the road-building market and began marketing a concept it called Koch Performance Roads.   Koch Performance Roads, Inc. (KPR), is an indirect subsidiary of Koch Industries, Inc. KPR and its affiliates embarked on a new business concept to provide state and local governments with a more cost-effective means to build roads and assure their performance for extended periods of time. The key concept of the business plan centered on KPR's assuming responsibility for all of the reconstruction, rehabilitation, and preventive maintenance work required to continue the road's performance at a high level over a long-term period of time (e.g., 20 years). KPR believed that by adopting a life-cycle approach to road construction, rehabilitation, and reconstruction, states could obtain a high-performing road for a longer period of time at a lower overall cost.  KPR projected that it could deliver these savings by combining superior knowledge (e.g., design, construction, management, asphalt) in the construction process with more active and continuous rehabilitation work during the long-term performance period.

Koch stated the purpose of the new asphalt technology in a "vision" statement for the project.:

> The Performance Road™ objective is to provide a road with lower life cycle costs. Agencies currently spend less on initial construction and then incur greater maintenance and reconstruction expense. A Performance Road™ would spend more on initial construction but would incur far less maintenance and reconstruction costs leading to lower life-cycle costs.

(Heitmann dep., Ex. 34).

Koch Materials, a Koch subsidiary, bought a French company called Elf Asphalt, whose flagship product was a polymer-modified asphalt.  Koch believed that the new asphalt, although more expensive than regular asphalt, would last longer, and it marketed it this way to New Mexico. Although Koch had also entered into other Performance Road projects on a smaller scale in Pulawki County, Missouri in 1997, and Springfield Road, Illinois in 1999, it is undisputed that the New Mexico project was KPR's first major project.

At the same time, Koch knew that under the New Mexico agreement, it bore the risk that the pavement would not last longer, and Mesa and New Mexico both projected reconstruction and rehabilitation work.

Pete Rahn, the Secretary of Transportation for the State of New Mexico, wanted to widen SR 44 from two lanes to four lanes. Because the State legislature would not agree to spend State funds, Mr. Rahn had to look elsewhere for financing.

Late in 1996, representatives of Koch met with officials from New Mexico about the Corridor 44 Project. They came up with a creative financing solution, using GARVEE Bonds. The State would issue bonds, and, through innovative financing provisions of the Federal Highway Administration (FHWA) would allow the State to pledge future federal-aid highway funds for a term of 18 years to the repayment of the bonds.

Bob Heitmann, Vice President of Koch Materials, met a few weeks later with Rahn and John Fenner, the Adjutant Secretary of Transportation, and discussed the concept of a long term contract or warranty. Koch presented, but Pete Rahn raised the concern that "if they were to fully leverage the funds coming from the Federal Highway Department . . . how were they able to keep from spending more money on that road while the bonds were being paid off?" Koch's representatives suggested that New Mexico solicit a competitive bid for constructing SR 44, and that the contract would include "performance measures necessary for that road for the full 20 years while those bonds were being paid off." (Heitmann dep. at 57). There was no discussion at the time about a warranty.

On April 21, 1997, Heitmann sent the Deputy Secretary for Highway Operations a draft proposal for the "financing, construction, and fiscal warranty of pavement that will have a lower life cycle cost to the taxpayer." The proposal included as "Warranty Terms" that the contractor would be "responsible for the condition and upkeep of the pavement for a period of 14 years or the occurrence of a specific number of Equivalent Standard Axle Loads (ESALs)." (Heitmann, Exh. 19).

4

**The Agreement**

On July 27, 1998, Mesa and SHTD executed the Agreement. The Agreement was the result of protracted negotiations, with at least ten drafts of the Agreement reviewed by Koch's in-house counsel, outside counsel, SHTD's attorneys, the New Mexico Attorney General's Office, and the FHWA. According to Pete Rahn, Koch was "well represented with legal counsel," because "[w]e understood this thing would be under a great deal of legal and political scrutiny, so we had to ensure that every "I" was dotted and every "T" was crossed." (Rahn Dep. at 21 and 78.).

The Agreement consists of three separately executed contracts, which govern two identifiable phases of the project: the Construction Phase, which related to Mesa's obligations to provide design and construction management services during the initial construction of the road; and a subsequent "Rehabilitation Phase." The government accurately notes that the term "Rehabilitation Phase" is not explicitly contained in the Agreement, but the court finds that the term is appropriate. The terms are a natural, accurate, and useful description of the obligation of Mesa/Koch to do reconstruction, rehabilitation, and preventive maintenance work with respect to the road that commences upon substantial completion of each road segment and continued for approximately 20 years. Mesa's obligations during the Rehabilitation Phase were divided into two parts: (1) doing all work necessary to assure performance of the pavement, which is governed by Exhibit E of the Agreement entitled "Pavement Warranty," and (2) doing all work necessary to assure performance of the structures (e.g., bridges, drainage and erosion structures), which is governed by Exhibit F of the Agreement entitled "Structures Warranty."

Mesa received $46,753,000 under the Professional Services Agreement for its Construction Phase services and $62,000,000 under the Pavement and Structures Warranties for its obligations under the Rehabilitation Phase, with $3,000,000 paid when the road design was complete, $6,000,000 paid at substantial completion of each of segments B, C, and D, and $41,000,000 paid at substantial completion of the road. Koch originally sought a refund for the full amount of the

income with the project with respect to the IRS's determination of deficiencies, including the $46,753,000 for the Construction Phase, but subsequently conceded that portion of the claim.

The Pavement Warranty commenced for each segment on the date the segment was substantially complete and will continue for a period of up to 21.5 years (or 20 years from completion of the last segment).  The Pavement Warranty contains an overall liability limitation equal to $175,000,000 in the first year after substantial completion of the road.  Commencing in year 2 and continuing for each annual period thereafter, the liability limitation is approximately $110,000,000, reduced by amounts already expended and increased by inflation at a 3.5% rate.

The Structures Warranty began for each segment on the date the segment was substantially complete and will continue for approximately 11.5 years. The Structures Warranty contains an overall liability limitation equal to $4,000,000.

The Construction Phase of the project was substantially completed by November 2001.

It is uncontroverted that, during the Construction Phase, Mesa's obligations included the design of the road and the overall management of the road's construction.  Although the United States disputes this contention, it does not cite any fact which would controvert the finding, other than noting (without an direct citation to a portion of the record) that a New Mexico State-licensed engineer was required to supervise contract services.  Moreover, the United States explicitly admits the plaintiff's contention (Fact ¶ 18) that under the Agreement "Mesa determined the way the work was to be performed, reviewed and commented upon the submissions of prospective bidders, and inspected and certified the construction work." Rahn of the FHWA testified that in the Construction Phase, the State "turn[ed] the contract over to Mesa for them to manage the construction work that was to be done." (Rahn dep. at 33-33, 38).

Due to state law requirements,  all construction work was let for bid under contracts directly with New Mexico.  Although Mesa had overall management of the construction, state law required that the construction contractors be paid directly by New Mexico from state funds separate from the

$46,753,000 paid to Mesa for its Construction Phase services. Those construction contractors were required to provide one-year warranties to New Mexico in their contracts.

As part of the Professional Services Agreement, Mesa provided a traditional Design Warranty and a traditional Construction Management Warranty. Professional Services Agreement §§ 12.1, 12.2. These warranties are separate and distinct from the Pavement and Structures Warranties that are the focus of this litigation. The three-year Construction Management Warranty, described in section 12.2 of the Professional Services Agreement, provides that Mesa will perform its construction management services in accordance with the standard of care normally practiced by construction management firms in performing services of a similar nature at the time and place the services are performed by Mesa.

Under § 1.1 of the Pavement and Structures Warranties, if the road's pavement or structures fail to meet the stated performance criteria at any time during the Rehabilitation Phase, Mesa must repair or replace the pavement or structures as necessary to cause them to meet such criteria. The performance criteria in the Pavement and Structures Warranties are stringent by industry standards. New Mexico is not required to establish or prove any design or construction defects relating to the road before the requirement to repair or replace becomes operational. All that needs to be shown is the road's failure to meet the stated performance criteria.

In addition, Mesa in its sole discretion may undertake such Reconstruction or Preventive Maintenance activities as it deems necessary or appropriate. For all of the required work during the Rehabilitation Phase, Mesa was required to provide design services; initiate, prepare, and submit bid packages to New Mexico; provide management and supervision services; provide certification to New Mexico of payments due and owing; and process purchase orders and other supervised contracts. Although the contracts for performing the repair work would be let for bid by the State, the reconstruction and rehabilitation work is to be performed under Mesa's control, is to be done in a manner determined by Mesa, and Mesa is responsible for its cost. Mesa would determine what work was done and how. According to Rahn of the FHWA, Mesa would have control and

responsibility for the road equivalent to what an "owner" would have.  (Rahn dep. at 36).  Indeed, the former Secretary of the New Mexico SHTD stated that Mesa was free to use peanut butter to build the road as long as NM 44 continued to meet the performance criteria.

As indicated earlier, due to state law requirements, all work under the Pavement and Structures Warranties is required to be performed under contracts let for bid by New Mexico.  After the Rehabilitation Phase began, the parties agreed on a modified procurement method that differed from the approach used during the Construction Phase in order to make it easier for Mesa to get rehabilitation work completed without New Mexico's involvement.  Rather than let a contract for bid each time construction work was required, as set forth in the Pavement and Structures Warranties at § 2.1, New Mexico agreed to permit job order contracting, which involves letting a single master contract for bid by New Mexico which sets forth unit costs for various types of jobs.  When Mesa determines that work is required, it prepares individual task orders defining the scope and specifications of the particular work to be done.

Mesa is required to inspect and certify the work of the construction contractors.  Moreover, it must reimburse New Mexico for amounts the State pays construction contractors for any reconstruction, rehabilitation, or preventive maintenance work that is done during the Rehabilitation Phase – even if such amounts exceed the $62,000,000 consideration received by Mesa.

Under § 1.2 of the Pavement & Structures Warranties, Mesa is responsible for virtually all work necessary to ensure that the road satisfies the performance criteria throughout the periods of the Pavement and Structures Warranties.  Mesa is excused from responsibility only for certain unusual damage to the Pavement or Structures:  (a) damage due to snow plows, vandalism, or cuts for utility crossings or installations or, unless caused by Mesa, damage due to accidents or spills and releases of hazardous materials; (b) damage due to a natural disaster within the meaning of 23 C.F.R. § 668.103 or due to a sudden and unusual natural occurrence not defined as a natural disaster, including a 50-year flood event, collapse, subsidence, falling rocks, explosion, fire, or Act of God; (c) damage due to civil strife or hostilities, including strikes, civil commotion, civil strife, riot,

8

terrorism, sabotage, acts of civil or military authorities, or an Act of War; and (d) damage due to weapon discharges or caused by military equipment or heavy construction equipment resulting from responses to mobilization of military or emergency forces.  Notwithstanding these exclusions, Mesa is not excused from responsibility for other consequences of such events (e.g., increased materials costs resulting from increased demand due to a natural disaster, delays caused by strikes).  Similarly, as to other acts of nature, the Force Majeure clause in the Pavement and Structures Warranties simply excuses Mesa from being in default in the performance of its obligations under the contract (except the obligation to make payment or reimbursement); it does not shield Mesa from increased costs due to the Force Majeure.  Mesa has no responsibility for routine maintenance, including vegetation control; landscape maintenance; litter control; right of way fence maintenance; courtesy patrol; repair of pavement markings, signs, delineations and object markers, and impact attenuators; lighting maintenance; sweeping; repair of guardrails and barriers; retention ponds/detention basins/outfalls repair; snow and ice removal; and cattleguard maintenance. Such routine maintenance remains the responsibility of New Mexico.

Unlike the Professional Services Agreement, the Pavement and Structures Warranties do not label Mesa as New Mexico's agent.  Mesa is also required to procure a surety bond equal to its liability limit under the Pavement and Structures Warranties.

**Party Expectations**

Both New Mexico and Mesa evaluated the expected cost of meeting the obligations under the Pavement and Structures Warranties over a 20-year period.  Both parties believed it was certain or virtually certain that the project would require substantial reconstruction and rehabilitation work to be performed during the term of the Pavement and Structures Warranties, as well as preventive maintenance that would extend the life of the road.  Leroy Sandoval, the Planning Division Director for the New Mexico SHTD,  believed that the agreements would "requir[e] substantial work" during the Rehabilitations Phase.  (Sandoval Aff. at ¶ 9).  Other witnesses, including FHWA officers who

were not parties to the agreements, agreed that substantial expenditures were virtually certain.  The United States has supplied no evidence showing any substantial possibility that Koch/Mesa might emerge from the Rehabilitation Period with zero expenses for repair or rehabilitation.

There is general industry agreement that milling and overlaying and full and partial depth patching constitute rehabilitation or reconstruction, while crack filling and sealing, shoulder maintenance, and surface/pothole patching constitute maintenance.  Depending on the extent of the work, fog sealing and other surface treatments may constitute preventive maintenance or rehabilitation.

The State of New Mexico anticipated substantial work during the Rehabilitation Phase. Under conventional practices and methods, New Mexico concluded that "at least two overlays of the full 119 miles of the project" would be necessary to maintain the roadway under the performance criteria set out in the Agreement.  New Mexico projected that these mills and overlays would cost almost $224 million, and that an additional $2.5 million would be spent on other rehabilitation.  All of the projections performed by New Mexico for the Performance Roads project anticipated there would be extensive reconstruction and rehabilitation during the Rehabilitation Phase.

A study performed by Applied Pavement Technology, Inc. for Koch regarding the expected life of roads built with the hot-mix asphalt (HMA) used on NM 44 determined unequivocally that "HMA pavements will not last 20 years without pavement rehabilitation;" generally, the first major rehabilitation or reconstruction work first occurs no later than between years 8-15. (Plf. Exh. 16).

Mesa prepared cost estimates as well, and it is uncontroverted that these estimates anticipated that substantial expenditures would be required during the Rehabilitation Period.  The United States disputes this fact (Plf. ¶ 46), but it supplies no evidence in support of its denial.  The evidence indicates that Mesa engineers prepared projections of maintenance and reconstruction to be performed over the term of the Pavement Warranty under the most likely case, best case, and worst case. The best and worst cases were each viewed as having a 1 in 40 (2.5%) chance of occurring.  Under any of the scenarios, Mesa expected to do milling and overlaying, full-depth patching,

surface/pothole patching, fog sealing, other surface treatments, crack filling and sealing, and monitoring and administration.  In the expected case, Mesa anticipated spending more than $40 million dollars, including more than $39 million on rehabilitation.  In the worst-case scenario, Mesa projected that it would spend slightly more than $94 million in expenditures, most of which (almost $93 million) represented rehabilitation. Even in its best-case scenario, Mesa expected to spend more than $17 million, including more than $16.5 million in rehabilitation. These amounts would be incurred over the 20-year term of the contract.  Id.

Dr. Rita Leahy, a pavement expert retained by Koch, with nearly 25 years of experience as a pavement engineer, opined that Mesa's projections were reasonable, but optimistic.  She determined that the likely cost of the work required for Mesa to meet its obligations under the Pavement Warranty would exceed the revenues Mesa received.  According to Leahy's projections, Mesa would incur the following spending during the Rehabilitation Period.

Mesa Spending (in $ million)

| Scenario | Total Spending | Rehabilitation Costs |
|---|---|---|
| Best Case | 68 | 44-50 |
| Expected Case | 102 | 70-83 |
| Worst Case | 131 | 90-109 |

Mesa's projections are subject to change because Mesa bears responsibility for any fluctuation in the precise amount of work that will be done, and the materials costs for completing that work are not predictable.

Under all projections by all parties associated with the project, Mesa would perform extensive rehabilitation and reconstruction throughout the Rehabilitation Phase.

**Use of the Term "Warranty"**

11

Notwithstanding the fact that both parties and the FHWA understood that Mesa would be required to engage in reconstruction and rehabilitation during the Rehabilitation Phase, the parties called the Pavement and Structures Warranties, "warranties." All of the parties involved, including the FHWA attached no legal significance to that label. The Pavement and Structure Warranties were the first of their kind in the nation. The United States has pointed to no other project which has similar provisions.

At the time, warranties that were used within the pavement industry limited coverage to defects in the pavement and did not require reconstruction and rehabilitation necessitated by normal wear and tear. Although some European countries employed warranties for the pavement itself, the only evidence is that these were for shorter periods of seven to ten years, compared to the 20-year provision in the Agreement between New Mexico and Koch. Typical warranties used in the American pavement industry extend only for the period within which latent defects are expected to manifest themselves, typically two to seven years. Absent such short-term defects, such warranties usually require no significant work.

The Pavement and Structures Warranties are thus significantly different from warranties that had been used in the road-building industry in the United States at the time of the Agreement, both in terms of scope and duration. They are also significantly different from the Design and Construction Management warranties in sections 12.1 and 12.2 of the Professional Services Agreement; from the one-year warranties used by New Mexico in the past and the warranties given by the construction subcontractors in their contracts with New Mexico; and from traditional consumer products warranties with which the parties had personal experience.

The term "warranty" was used for the Pavement and Structures Warranties at the request of New Mexico for political reasons: the term "warranty" was used as an analogy to explain the novel concept to the New Mexico legislators and the public. Koch never agreed with the characterization of the agreements as "warranties." Internally, Koch officers disagreed with the term.

12

The term "warranty" in its traditional usage did not accurately describe the extent of the obligations imposed on Mesa, which were much greater than those of a traditional warranty. The Pavement and Structures Warranties were heavily negotiated by a specific "warranty team," distinct from those negotiating the Professional Services Agreement.

The price for the Pavement and Structures Warranties was separately stated in the Agreement and paid separately. The $62,000,000 price was a far greater percentage of the initial construction price than one would expect for a traditional warranty.

Mesa earned no profit under the Professional Services Agreement and relied on the Pavement and Structures Warranties for its profits.

Both the Pavement and Structures Warranties remain in effect today. As of July 2007, Mesa had spent approximately $8 million on the Pavement Warranty and just under $2 million on the Structures Warranty. Current projections indicate that Mesa will expend an amount between the original expected amount ($40,942,870) and the original downside case amount ($94,010,183) to meet its obligations.

**The FHWA**

Before entering the Agreement, New Mexico was required to seek approval from the FHWA to use federal funds for the project. Although not itself a party to the Agreement, the FHWA was very involved in the project. Three FHWA technical writers went to New Mexico to help prepare a SEP-14 (Special Experimental Project) and to help draft applications, which allowed the State to request warranties. The FHWA helped structure the State's request for proposal. The FHWA was also involved in the negotiation and review of the Agreement. Rueben Thomas, the District Administrator for the FHWA, received copies of correspondence between SHTD's General Counsel and Koch's outside counsel, and made comments on and suggestions about the draft Agreement.

Federal funding is available only for work that qualifies as "construction" under the Federal Highway Law.  23 U.S.C. §§ 101(a)(3), 119(a).  The federal government will not fund routine "maintenance," but may fund "reconstruction, rehabilitation" projects.  (Evan dep. at 8-9).

In a letter dated August 28, 1997, to the Acting Chief Counsel of the FHWA, Arthur Waskey, General Counsel for SHTD, assured the FHWA that the Corridor 44 Project was in compliance with New Mexico procurement laws. Waskey specifically mentioned Section 13-1-28 through 13-1-199 of the New Mexico Procurement Code, which forbids design-build for highway projects, and noted: "Since the Project will be designed by one entity and constructed by a completely independent entity, the Project is not design-build." Waskey noted that the Attorney General's Office would approve the project, and that "the Department strictly kept the distinction between the PDC's services and subsequent construction." (Thomas Dep. Exh. 78).

John Fenner of the SHTD asked the FHWA if there was anything in FHWA regulations which explicitly referenced the eligibility of a warranty reimbursement. Counsel for the FHWA on June 5, 1998, stated that warranty provisions can be included in federal aid highway provisions, subject to the approval by the Division Administrator. Citing 23 C.F.R. § 635.413, counsel stated: "Warranties must be for specific construction product or feature and not for maintenance items not eligible for Federal aid." (Thomas Dep. Exh. 88).

There is nothing in the record to indicate that the FHWA determined that the Pavement and Structures Warranties were in fact "warranties" in a traditional legal sense.  The FHWA authorization included the requirement for Koch/Mesa to provide "warranty and  preventative maintenance services" under the Warranties. In this context, the FHWA essentially construed "maintenance" in a colloquial sense to include all reconstruction or rehabilitation activities including surface and full-depth patching, milling and overlaying, and micro surfacing treatments provided to "extend the service life of the pavement." (Def. Exh. 32, at 9). Under 23 U.S.C. §§ 101(a)(3) and 119(a) the FHWA funds highway construction contracts; it cannot fund maintenance contracts.

14

Rueben Thomas, on behalf of the Federal Highway Administration, executed a Federal Project Authorization Agreement on July 31, 1998, for the disbursement of $420,000,000 in federal funds. According to the approval documents, the project was approved as an Innovative Financing Project and Innovative Contracting Project. "The authorization includes the award of the contract to Mesa PDC, LLC., the Project Development Contractor, to provide final design, construction management, and warranty and preventive maintenance services for the Corridor 44 Project." With respect to maintenance, the FHWA wrote: "Future maintenance expenditures necessary to meet the warranty criteria, shown in Table 3, were estimated for each alternative as part of a normal sequence of rehabilitation to ensure that the entire project would endure beyond the 20-year warranty period by a minimum of five years." (Def. Exh. 32, at 4).  The cost was broken down as follows:

| | |
|---|---|
| Design | $ 8,320,000 |
| Construction Management | 24,150,000 |
| Insurance | 3,500,000 |
| General & Administrative | 5,000,000 |
| Development Fee | 5,500,000 |
| Construction (estimated) | 187,530,000 |
| Warranty | 62,000,000 |
| Interest | 124,000,000 |
| Total Federal Cost | $420,000,000 |

The defendant cites Reuben Thomas's deposition statement that in approving the project, "[The FHWA was] approving the Warranty." (Thomas dep. at 11 -12). The deposition testimony, in context, demonstrates that (consistent with the findings above) that FHWA approval reflected an understanding that the warranty would require construction costs:

Q. Because the folks in Washington included the cost of the warranty as something that the feds could cover, does that tell you anything about what they concluded about the work that would be required under that 20-year contract, i.e., whether it was something more than mere maintenance?

A. Yes, it was.  They approved it as an innovative contracting procedure, a new concept that they wanted to look at.  So it was approved, which required experimental documentations on how it worked and that type of stuff.

Q. Now, you said a little while ago that the federal highway financing couldn't pay for maintenance, but could pay for construction, rehabilitation, reconstruction, et cetera.  Correct?

A. Yes.  Correct.

15

Q.   So is the fact that the federal government was prepared to include and pay for the cost of the 20-year contract is here indicative of whether Washington reached a conclusion as to whether that was a contract for maintenance, or had elements of a contract for construction, reconstruction or rehabilitation?

. . .

A.   We were approving the warranty –

(Id. at 9-12). Thomas thus testified that the FHWA's approval reflected a conclusion that the Agreement called for construction.


**Implementation of the Agreement**

The Agreement states the term "Agreement" meant the Agreement for Project Professional Services and the Pavement and Structures Warranties, together with all Exhibits attached. The Exhibits attached to the Contract were:

Exhibit A. Scope of Design Professional Services
Exhibit B. Scope of Construction Management Professional Services
Exhibit C. Term Sheet
Exhibit D. Payment Bond
Exhibit E. Pavement Warranty
Exhibit F. Structures Warranty

Under Section 11.1 SHTD would  pay $46,320,000 to Mesa PDC as full compensation for professional services. Section 11.7 of the Agreement provides that $62,000,000 be paid by SHTD to Mesa as full compensation for the Warranty. Section 11.7.1 states

the Warranty Price includes (I) all design, equipment, materials, labor, insurance and bond premiums, home office, job Site and all other overhead, profit and services relating to the Warranty; (ii) all services, equipment, materials, labor provided by PDC Subconsultants; (iii) supervision and management of Warranty work, and (iv) all deliverables specified in the Warranty, Exhibits E and F.

It further provides that "Title to all deliverable shall pass from PDC to SHTD at the time the Warranty Price is paid in full." The Warranty was to be paid according to a time line outlined in Section 11.72 of the Agreement.


$3,000,000 at completion of the Design Complete Schedule
$6,000,000 at substantial completion of Segment B

16

$6,000,000 at substantial completion of Segment C
$6,000,000 at substantial completion of Segment D
$41,000,000 at substantial completion of the Project

A Schedule of Values was used for SHTD to make partial progress payments for the Professional

Services on a monthly basis. The Agreement created the following revenues:

| | |
|---|---|
| Professional Services – Section 11.1 | $ 46,320,000 |
| Professional Services – Amendment #3 | 433,000 |
| Warranty – Section 11.7 | 62,000,000 |
| Total Contract | 108,753,000 |

(Karpoff Decl. Exh. 33).

The design services portion of the Agreement required Mesa to prepare bid packages for

SHTD to use when obtaining road construction contracts with the general contractors that would

actually build the road. The design-services portion of the Agreement also required that Mesa

provide SHTD with technical assistance during the construction bidding process and provide

engineering and design recommendations on the structures foundations, the pavement design, and

the drainage. The construction management services portion of the Agreement required Mesa to

assist in project planning, to coordinate with the various stakeholders involved in or affected by the

project (such as the general contractors, the public, and tribal governments), to provide partnering

workshops for stakeholders, to assist in the design-development phase, to review change orders, and

to provide certain procedures and project manuals. To perform these services, the Agreement

allowed PDC to subcontract these obligations. It also specified which professional engineering and

construction management firms could be used. (Agreement Section 3.2.)

Section 3.5.6 of the Professional Services Agreement states "SHTD shall let to bid through

competitive sealed bidding, invitations for bids prepared by PDC for performance of Work." Section

3.5.7 states "SHTD shall enter into contract with, and upon receipt of certification of PDC make

payment to, contractors awarded contract to perform the Work." This section also requires SHTD

to notify such contractors that PDC, as SHTD's agent for construction management, administers all

contract and purchase order for the Work. The Contract defines "Work" as all of the construction,

reconstruction materials, equipment, services and all other items and activities to be furnished and provided by SHTD's construction contractors and suppliers for the Project.

The "Warranty" is defined in the Agreement to both mean the Pavement Warranty instrument and the Structures Warranty instrument collectively. Section 12.1.1, discussing a three-year design warranty, states "PDC makes no warranties relating to the Work performed by construction contractors, nor does PDC make any other warranties, express or implied, which are not expressly set forth in this Agreement."

The Pavement Warranty provides:

> PDC warrants that during the term of this Warranty the Pavement shall meet the Pavement Performance Criteria. If at any time during the term of this Warranty any portion of the Pavement described in the Pavement Performance Criteria shall fail to meet to applicable Pavement Performance Criteria, PDC, shall Repair or Replace the Pavement to the extent necessary to cause such portion of the Pavement to meet the Pavement Performance Criteria.

(Karpoff Decl. Exh. 33, ¶ 1.1).

The Pavement Warranty required Mesa to:  (i) provide design services if necessary; (ii) initiate, prepare and submit a bid package to NMSHTD; (iii) "provide management and supervision services for all Warranty Work" and certify to NMSHTD payments due and owing under contracts for Warranty Work; and (iv) process purchase orders and other supervised contracts. SHTD, with the assistance and upon the non-binding recommendation of Mesa, would (i) prequalify construction workers; (ii) advertise invitations to bid; (iii) receive bids, conduct bid openings, open and read bids, perform bid analysis and award contracts; (iv) enter into contracts with contractors, suppliers and vendors for the Warranty Work; and (v) upon certification by Mesa, make payments to the contractors. (Karpoff Decl. Exh. 33). Mesa "at its sole discretion may undertake such Pavement Reconstruction or Preventative Maintenance activities as it deems necessary or appropriate." Mesa was to reimburse SHTD for amounts SHTD expended for Warranty Work. (Id. at ¶ ¶ 2.2 and 2.8).

The Pavement Performance Criteria, to which the Pavement Warranty referred, listed certain minimum acceptable criteria by periods, and established the minimum acceptable criteria for the payment over the term of the Warranty. The periods are divided into four periods of five years'

18

duration, and include performance criteria for smoothness, rut depth, cracking, bleeding, raveling, delamination, pot holes, depressions and shoving. Attachment 2 outlines Mesa's liability limits through year 20 of the warranty. The Pavement Warranty contains an overall liability limitation equal to $175,000,000 in the first year after substantial completion of the road.  Commencing in year 2 and continuing for each annual period thereafter, the liability limitation is approximately $110,000,000, reduced by amounts already expended and increased by inflation at a 3.5% rate. The term of the Pavement Warranty is outlined in Section 1.3 of Defendant Exhibit E, which states the term of the Warranty will commence as to each segment on the date on which Substantial Completion of such Segment shall occur and shall continue with respect to such Segment and run for twenty years or 4 million ESALs (Equivalent Standard Axle Loads).

The Structures Warranty states, "PDC warrants that during the term of this Warranty the Structures shall meet the Structures Performance Criteria." "If at any time during the term of this Warranty any of the Structures shall fail to meet the Structures Performance Criteria, PDC shall Repair or Replace the Structure to the extent necessary to cause it to meet the Structure Performance Criteria." The Structures Warranty further provides: "This Section 1.1 does not require SHTD to establish or prove a defect in design or construction management as a condition to PDC performing its obligation under this Section 1.1." Attachment 1 is titled "Structures Performance Criteria" and establishes the minimum acceptable criteria for the Structures over the term of the Warranty. The Structures Warranty has a term limit of ten years or 2,000,000 ESALs, and a liability limit of $4,000,000. (Karpoff Decl. Exh. 9).

The Agreement allowed Mesa to subcontract out the design and contract management professional services to specific firms. Mesa did subcontract out design work to CH2M Hill, and construction management to Flatiron. These companies are referred to in the Agreement as subconsultants. Both companies were unrelated to Mesa. Koch paid those firms $34,020,000 and $8,320,000, respectively, for their services (a total of $42,340,000).

19

In accordance with Section 3.5.7 of the Agreement, during the Construction Phase SHTD directly entered into subcontracts with four general contractors, all unrelated to Koch, to perform the actual construction job of widening NM 44. Each of the four general contractors was responsible for one of four segments of the NM 44 project. The four general contractors were: Sundt Construction, FNF, LaFarge, and E.L. Yeager. The State's payments to the Construction Phase General Contractors were not part of SHTD's Agreement with Koch, but rather were separate contracts each Construction Phase General Contractor entered into with the State.

Actual construction was substantially completed in accordance with the terms of the Agreement as follows:

| | |
|---|---|
| Segment A | November 16, 2001 |
| Segment B | October 16, 2000 |
| Segment C | November 16, 2001 |
| Segment D | September 6, 2001 |

Koch had no construction equipment in New Mexico. Indeed, during the construction phase the only equipment Koch had in New Mexico for its three full-time employees based there was a couple of cars. Mesa acted as an agent of the State of New Mexico during the Construction Phase. During the Rehabilitation Phase, Mesa operated as the general contractor, with control over and financial responsibility for the costs of the work.

Under the Agreement, work covered by Koch's Warranty is performed under a contract let for bid by SHTD, known as the Job Order Contract ("JOC"). The State entered into the JOC with A.S. Horner, Inc. For such Warranty work Koch prepares a Task Order for Horner. Horner then performs the work and sends an invoice to the State, the State pays Horner and then bills Koch. Koch then reimburses the State for the money it paid to Horner. (McWaters Dep. at 39-43; and 88-89 (attached as Exhibit 31 to Karpoff Decl.)).

Mesa reviewed and modified the "US 550 Pavement Maintenance Contract General Conditions," for Job Order Contracts which provides: "The work shall consist of performing maintenance, preventative maintenance and repairs to the roadway and as necessary to the adjacent shoulders and includes removal and replacement of damaged sections of the roadway, milling or

surfacing, paving, patching of surfacing, sealing of cracks, fog sealing roadway surface, striping and other related work" (McWaters dep. Exh. 162)

In a letter to Max Valerio, the engineer in charge of the project, dated June 24, 2005, Mesa protested a Letter of Demand for Job Order Contract Documentation. Schmidt, Mesa's administrator of the Agreement, wrote: "Contrary to the implications of your letter, Mesa PDC is performing services to manage 'maintenance and repair work' as labeled in the actual contracts and so ordered by NMDOT in conformance with our July 27, 1998 agreement for Corridor 44 Professional Services and Warranty." (McWaters dep. Exh. 118).

According to a report Mesa submitted to Valerio on May 29, 2007, the life-to-date "Pavement Warranty Expenditures" as of March 31, 2007, were $7,883,106.41. Of those expenditures, $6,684,452.25 was Mesa's reimbursement of job order contracts. The report showed that while 26 % of the cumulative term of the Warranty had elapsed, only 6.7 % of the limit of liability had been expended. However, the level of expenditure is consistent with Koch's projections that the ultimate price tag for the repair work (most of which would come towards the end of the warranty period) could total some $40 million.

In a brochure Koch drafted entitled, "The New Mexico State Route 44 Highway Project," the Warranty was described as follows:

> In the Warranty Agreement, the pavement is covered for up to twenty years or to a certain amount of use, whichever comes first; structures, such as bridges [or] and culverts, are covered up to ten years. The NM 44 warranty is similar to a warranty you might receive with the purchase of a new car– three years or 36,000 miles. . . . Having the warranty means the state of new Mexico will not have to maintain or repair the pavement on NM 44 for the many years to come.

(Valerio Decl. Exh. A).

Arguing against the plaintiff's contention that its lawyers were not involved in the negotiations concerning the warranty, the United States points to the correspondence between Koch and the SHTD, arguing that the correspondence demonstrates that the "warranty" was a bargained-for provision used in its traditional legal sense. Thus, on December 10, 1007, shortly after the Mesa bid on the SR 44 Project, Leroy Sandoval on behalf of SHTD sent a five-page letter to Mesa

discussing various aspects of the warranty. Fred Abbott, representing Koch, wrote a letter to Arthur Waskey, SHTD General Counsel on January 21, 1998, concerning the "Mesa Warranty Liability." In reference to a conversation of the previous day, Mr. Abbott bluntly stated that "Mesa rejects 'no fault' or 'strict liability' under the warranty." He cited several reasons, including that Mesa's offer was for a limited warranty. (Karpoff Dec. Exh. 3).

Mickey Hines forwarded an e-mail to Abbott on January 28, 1998, attaching a draft of language for the drainage structure warranty. Mike DiLembo, who provided the information to Hines, wrote: "I realize that the attorneys have to have their turn at it to make sure the legal requirements are in order for New Mexico, so you can use the draft as a source document to extract the technical requirements and fold them into the overall warranty that you are composing." (Karpoff Dec. Exh. 4).

On April 8, 1998, Stan Betzer, SHTD outside counsel, wrote to Abbott discussing revisions to the agreement and warranty package. Betzer wrote: "As a reminder, we are definitely looking for an early response that reflects the current thinking of Mickey Hines and his counterpart at SHTD on the performance criteria for the pavement and the structures." (Karpoff Dec. Exh. 5).

On April 13, 1998, Abbott wrote to Betzer, stating with respect to the warranty provision:

We must address two threshold issues. PDC has not agreed: (1) to extend the warranty term; or (2) to payment of the Warranty Price at Final Acceptance. As SHDT has structured warranty commencement and payment of warranty price PDC may be required to finance maintenance and warranty services in advance of receipt of payment. Extension of the warranty term may adversely affect PDC's enforcement of warranties of the construction contractors and material suppliers.  Performance Criteria will require re-examination. Mr. Hines is addressing the matter. I will forward his suggestions when I receive them.

(Karpoff Dec. Exh. 6).

John Fenner, Adjutant Secretary of SHTD responded two days later, stating, "With Fred's letter of April 13, we just do not see where Koch is standing behind its assertion of its ability to build a better road." (Karpoff Dec. Exh. 7).

On May 8, 1998, Abbott sent a fax to Arthur Waskey, General Counsel for SHTD, asking for a revision to one section of the agreement at the request of Koch tax counsel. Waskey replied on

May 15, copying Pete Rahn and John Fenner, about an item Abbott raised in the negotiations. Waskey quoted Abbott's May 14 correspondence: "If SHTD has doubts as to the legality or constitutionality of the Agreement or Warranty PDC needs to know. If SHTD develops such concerns or other agencies of the State express reservations, I trust PDC will be informed prior to purchase of Bond Anticipation Notes."

Waskey responded by assuring Abbott that there were no doubts as to the Agreement's legality or constitutionality. He continued:

> Nevertheless lest there be any doubt that SHTD has not from the beginning of negotiations, and consistently and forthrightly thereafter, alerted you and Mesa/Koch to areas of the Agreement where we must carefully assure that we are in compliance with state law, I list them as follows:
>
> (1) This is not a design/build contract and therefore Mesa cannot provide any construction;
>
> (2) Specific language from NMSA 1978, Section 56-7-1 must be included to avoid the Warranty from being an impermissible agreement to indemnify;
>
> (3) SHTD's intent is to secure financing backed by federal highway funds, although it will use its best efforts to obtain other valid sources of funding;
>
> (4) The Warranty must be secure and void of SHTD continuing obligations that it is clear that PDC's obligation to provide the Warranty is satisfied when the Warranty Price is paid, and that the only remaining tasks for the 20+ years of the Warranty are inspection, preparing invitations to bid, issuing construction contracts and subtracting Expenditures from the Warranty liability limits provided by the PDC, therefore allowing the warranty to survive the term of the Agreement.

(Karpoff Dec. Exh. 9).

On June 26, 1998, Abbott forwarded to counsel for SHTD background information for the bridges and drainage performance criteria. On June 29, Betzer sent to Abbott and Ron Hull, general counsel for Koch, marked changes on the criteria. On July 15, Abbott sent a fax to Hull and employees of Koch Materials concerning the "Warranty and Preventive Maintenance Services Performance Bond." The fax attaches the revised draft and states: "When I receive confirmation of the acceptability of the revisions, I will discuss with New Mexico counsel, inclusion of the agreed Bond form in the Warranty documents." (Karpoff Dec. Exh. 12).

23

**The Prior Negotiations of the Parties**

The United States contends that the "warranty" language contained in the Agreement was not, as characterized by Koch, a matter of salesmanship focused particularly on the New Mexico project, but a standard term in Koch's Performance Roads sales.  In support of this contention, the United States cites Exhibit 1 in its response, a document produced by one of Koch's potential customers, Herzog.  Koch has separately moved to strike Exhibit 1 on the grounds that, contrary to the defendant's representation, the document is not in fact authored by Koch and that the document is hearsay.  In response to the motion to strike, the United States presents two arguments.  First, it stresses the refusal, on advice of Koch's counsel, of  Brian McWaters to testify as to Koch's prospective customers.  (Dkt. No. 116, at 3).  Second, it argues that the document was received by Herzog, the potential customer of Koch, and is admissible as a business record of that company.

The court concludes that Exhibit 1 lacks evidentiary value.  The first point of the United States is simply irrelevant to the question of whether the document contains hearsay.  The second argument is also unavailing.  It fails to account for all of the multiple levels of hearsay the document presents – it merely establishes that the document Herzog kept in the normal course of business.  Business records frequently comprise multiple hearsay levels.

> Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by Rule 803(6). *United States v. Baker*, 693 F.2d 183, 188 (D.C.Cir.1982). However, if the source of the information is an outsider, as in the facts before us, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have. *See United States v. Davis*, 571 F.2d 1354, 1360 (5th Cir.1978). Further, Federal Rule of Evidence 805 requires that all levels of hearsay satisfy exception hearsay requirements before the statement is admissible.

*Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir. 1991).  The truth of the statement contained in the document that the warranty included in the Agreement is a "standard" one which Koch gives to "customers around the country" are statements by persons unknown, statements

presented for the truth of the matters asserted.  This statement is not a representation by Herzog, and the government has not identified the source of the statement, or shown an applicable hearsay exception.  Accordingly, the court will grant the motion to strike on this issue.[1]

Internally, Koch's management disagreed with the term "warranty," but decided to use the term to be internally consistent with the State and not confuse the political process.  According to Heitmann, Koch understood that attaching the term "warranty" to the Agreement had no independent legal significance, given that the Agreement encompassed many more obligations than that of a standard warranty; if the company understood that some term "warranty" had such independent significance, it would not have agreed to the inclusion of the term. The term "warranty" was not negotiated as a part of the contract after Koch's proposal was submitted.  Both Koch and the State anticipated much more work than reflected in a standard warranty.

In a draft summary of the "Performance Road Play" dated June 16, 1997, an internal Koch document, the project's sponsor, Bob Heitmann, noted that "there exists an opportunity to privately finance, construct, and warrant the expansion of SR 44 in northern New Mexico." (Karpoff Decl. Exh. 16).

In a document entitled "Koch Material Company SR-44 Proposal Development" dated July 23, 1997, Koch Materials advised Koch that SHTD was drafting a Request for Proposal and potential developers would have 60 days to reply with a proposal to "finance, design, build, and warrant the project," which would include a proposal to "Warrant the pavement for a predetermined period of time." The document recommended steps to initiate the proposal development process, which included direct involvement with "Legal." (Karpoff Decl. Exh. 15).

On August 29, 1997, the SHTD issued a request for proposal (RFP) soliciting bids to provide design, construction-management, a warranty, and possible financing services to SHTD to widen NM 44 between the towns of San Ysidro and Bloomfield from two to four lanes. The RFP was to:

---

[1]The Reply of Koch indicates that it has withdrawn its motion to strike as it relates to matters other than Exhibit 1. (Dkt. No. 119 at n.1).

solicit competitive proposals for the award of a contract to a Project Development Contractor (PDC) that shall be retained, subject to Federal Highway Administration (FHWA) authorization, by the SHTD to obtain financing for the Corridor 44 Project and to provide final design, construction management, and warranty, and preventative maintenance services for the Corridor 44 Project.

The RFP requested, among other things:

> The PDC, following substantial completion of the proposed highway improvement and the opening of reconstructed NM 44 to traffic . . . shall undertake to provide warranty and preventive maintenance services to the SHTD for a term of not less that 5 years and not more than 20 years.

The RFP described in detail the services for design, construction management and the warranty. For the warranty the RFP provided:

> The SHTD's goals for the Corridor 44 Project are to obtain a safe, high quality roadway at a reasonable cost for the traveling public. It is therefore the SHTD's intent to require the PDC to provide warranty and preventive maintenance services that are directly related to the quality of the major design and construction elements for a predetermined period of time and to place all ordinary maintenance responsibilities on the Department.

(Valerio Decl. Exh. D).

On December 1, 1997, Koch submitted the only bid in response to the RFP. The bid was for one price, which included the design, professional services, construction management, and warranty. The RFP made clear that the warranty portion "must be proposed and evaluated independently of the design and construction management portions of proposals."  (Dkt. No. 89, Gov't. Ex. B at 9.)  The price for the Pavement and Structures Warranties was separately stated in the Agreement and paid separately.  § 11.1; 11.7.

> In its proposal, Mesa describes its base warranty as a 20-year pavement warranty: We are prepared to negotiate warranty items for these items at an additional cost based on maintenance standard for the existing NM44 bridges we will add to our maintenance program. This is the standard 20-year pavement warranty that Koch Materials provides to the Performance Roads™ customers around the country. In summary, our proposed pavement warranty provides for 20 years of inspection, monitoring, and preventive maintenance and emergency maintenance of the NM44 corridor.

(Valerio Decl. Exh. C). At the same time, Mesa indicated that "long-term transportation infrastructure warranties are a relatively new, untested approach," and neither prior "warranty" project to which Koch referred was as long as the twenty-year agreement for NM 44. The State

agreed that this was a "first time long term warranty."  (Def. Exh. 8 at 2658; 2664). Moreover, this exhibit supports the construction placed on it by the United States – that the Pavement and Structures Warranties were "standard" warranties in the common legal sense of the term.  The proposal explicitly states that the "Warranty" provisions reflect "the standard 20-year pavement warranty *that Koch Materials provides to the Performance Roads™ customers* around the country."  The evidence is otherwise wholly uncontradicted that the Performance Roads concept was new, that the New Mexico Project was the first to implement the concept on a major scale, and that the Pavement and Structures Warranties integrated into the Agreement were a first-of-the-kind in the pavement industry.

In response to written questions from John Fenner about the allocation of the project cost between construction and warranty, Mesa replied on December 8, 1997: "The project development tasks within our approach are interrelated – reducing the effort on one element increases the effort on another. Therefore, Mesa has proposed a $110 million amount which includes design, construction management, QA/QC, 20-year pavement warranty, and project administration. This amount excludes construction costs, utilities, right-of-way, permits, environmental mitigation, and project finance costs." (Karpoff Decl. Exh. 24, 25).

On December 4, 1997, Leroy Sandoval, Transportation Planning Division Director and Warranty Team Chair for the SHTD, wrote to Mesa, to request clarification about the proposal. He wrote: "Mesa Developers indicates that the warranty proposal being provided is a standard 20-year pavement warranty provided to 'Performance Roads customers.'" We understood this to be a formal warranty document. Please provide us a copy of that document. Mesa responded by attaching a "draft warranty document." (Thomas dep. Exh. 84, 85). Sandoval also stated:

> Although an annual plan for warranty and preventive maintenance work is shown to be developed once the warranty process is to take place, the intent of the department in the RFP was to obtain an initial Preventive Maintenance Plan to show what activities the proposer intended to include in the plan. Please provide what you anticipate the activities to include.

Mesa replied:

27

> Until we further define the project with SHTD, we cannot develop a fully detailed preventative maintenance plan. Using present technology as a base, maintenance activities over the 20-year warranty period are anticipated to include such tasks as mill and overlays, 2-inch overlays, surface treatments, fog seals, full-depth patching, surface patching, shoulder maintenance, crack filling, and joint sealing.

(Id., at ¶ 14). However, the uncontroverted testimony of the witnesses involved with the Agreement is that the term "maintenance" was used here in its colloquial sense only, and was intended to apply to work after the Construction Phase, including rehabilitation and reconstruction.

> Mesa wrote:

> By using specific pavement distresses instead of indices, Mesa Developers intends to provide a clearly definable basis for the warranty. Because of the 20-year warranty duration, Mesa Developers has the incentive to render repairs to the pavement as soon as possible, to avoid pavement deterioration resulting from neglected maintenance, Visual inspections made by qualified SHTD staff enhances the annual pavement condition surveys. If the pavement conditions are found to be outside of the warranty requirement, repairs will be performed in accordance with paragraph 6 of the warranty.

(Thomas dep. Exh. 85, ¶15). Under this provision, the State would not have to demonstrate any defect in design or construction to trigger the obligation to replace or repair, it only had to show that the road failed to meet the performance criteria.

Heitmann wrote a letter to Rahn on February 16, 1998, attaching a schedule of how the "warranty cap" would work: "The concept is that we would have to spend the $60MM plus annual increase of 3.5% on work needed to keep performing at the appropriate PSR." The "Pavement Warranty Concept" was described in the attachment as follows: "The state will pay Mesa $60 million for a pavement warranty. Mesa agrees to maintain the pavement for twenty years at an agreed upon PSR, at not [sic] time going below 3.0." (Karpoff Decl. Exh. 13). Under Pavement Warranty § 3.3.2, Mesa's liability was limited by the overall liability limitations contained in the Pavement and Structures Warranties. The Pavement Warranty cap equaled $175,000,000 in the first year after substantial completion of the road. Commencing in year 2 and continuing for each annual period thereafter, the liability limitation is approximately $110,000,000, reduced by amounts already expended and increased by inflation at a 3.5% rate. The Structures Warranty contains an overall liability limitation equal to $4,000,000.

28

Engineers and financial analysts with Koch prepared numerous spreadsheets to analyze the profitability and risk of the proposed project. Bob Huitt, a financial analyst who prepared many of the spreadsheets, testified about the factors Mesa considered in determining whether it would have to perform mill and overlays over the twenty-year period of the Warranty:

> I think, as I described earlier, it's the ultimate pavement design, the ultimate quality of construction, the ultimate quality of the materials used, the traffic and loading of that traffic and the weather conditions. All of these things at the time you design it and estimate it are unknown. They're future events that cannot be predicted.

Huitt also testified:

> This, however, is a longer-term warranty of 20 years, and we fully expected in even the potential [best] case to go out and do a certain amount of maintenance and rehabilitation, repair, reconstruction to keep the pavement at a level of performance that would be stipulated in any contract.

(Huitt dep. at 30). Mesa predicted that it would spend between $10,561,00 and $59,235,00 on rehabilitation during the Rehabilitation Phase. (Id. at 66). All of the witnesses providing testimony have stated that it was virtually certain that Koch would spend a significant amount for reconstruction and rehabilitation.

Huitt agreed during his deposition that could not accurately predict how much it would have to spend, because of fluctuations in the amount of work required and the price of materials. However, he testified that significant work would be required.

The United States notes that in spreadsheets Koch charted "Mesa Developers Warranty Cost Estimate Breakdown" over a twenty-year period, which predicted "Warranty Revenue" over "Maintenance Year(s)." The expected case was broken down by "Warranty Costs" with a "Description of Maintenance Expected to be Performed." The defendant points out that one projection indicated a total net present value of the Warranty Costs of $9,812,536. (Karpoff Decl. Exh. 26). Koch stresses that it performed numerous projections, and that the one selected by the government is the smallest, and one reflecting the best potential outcome. The same projection indicated expected costs of $24,362,00 for pavement costs, and $2,000,000 under the Structures Warranty. Other projections indicated even higher potential costs for repair.

29

In an internal Koch document dated February 2, 1998, requesting approval to execute an offer to SHTD, Koch explained the Pavement warranty as follows: "KMC will warrant the pavement for 20 years and cause to be performed the necessary preventive maintenance and rehabilitation to meet a pavement serviceability rating. Pavement warranty price, $60 MM, less the cost to service that warranty is the primary profit driver." The same document describes the BDE Warranty: "KMC will warrant bridge, drainage and erosion control structures (BDE) for 10 years and cause to be performed the necessary repair of site-specific defects. BDE warranty price is $2MM and the liability limitation is $4MM." The Document explains that Koch "can maintain the pavement for one third the cost of NMSHTD" because of its custom pavement design, incentives and resources for proactive preventive maintenance, quality assurance during production, and quality based-selection of contractor. (Def. Resp. Exh. 28).

In a later internal update on the project, dated May 4, 1998, Koch summarized the Warranty Underwriting Profit:

> Up-front warranty revenue less future expenses. KMC will receive $62MM, $3MM in 1999, $12MM in 2000 and $47MM in 2001 . . . up-front to perform reconstruction and maintenance required to maintain an agreed level of serviceability (Lack of problems such as roughness, cracking, rutting and potholes) for 20 years."

Koch identified its role in the project as:

- Leader/developer
- Pavement criteria
- Materials criteria
- Maintain road serviceability
- Insurance procurement and management

Koch acknowledged its risk to be "Road reconstruction and maintenance costs" during the Rehabilitation Phase. New Mexico assumed the construction costs during the Construction Phase. This same language was used in the venture package Rob Witte, the President of Koch Materials, submitted for final approval to Koch's directors on May 13, 1998. The Project's sponsors acknowledged that the timing and magnitude – but not the fact – of the future expenses was uncertain.

Abbott wrote an e-mail to Stan Betzer, outside counsel for SHTD, on May 18, 1998, commenting on the latest draft of the Warranty. In regard to one section of the Warranty, Mr. Abbott wrote: "A rose is a rose is a rose. Either Sect. 1.1 is an effective statement of a performance warranty or it is not." (Def. Resp. Exh. E). The government suggests that the e-mail demonstrates the parties understood the contract to include a performance warranty. It is unclear which draft of the Agreement this e-mail is referring to, or what Abbott understood a performance warranty to mean. The general language in the earlier drafts of § 4.12 provided:

> PDC acknowledges and agrees that SHTD shall have no obligation to prove any defects in design, construction management, or Work as a condition to PDC's obligations under this Warranty. If the Roadway fails to meet the standards set forth in Subsection 1.1 hereof, PDC shall at its sole cost and expense in accordance with this Warranty repair and replace the affected portion of the Roadway to a condition that meets the standards then applicable under the Roadway Performance Criteria.

(Def. Exh. 32-33). In this context, the Abbott-Betzer correspondence reflects an inquiry whether the plaintiff's obligation to repair and rehabilitate was triggered by performance criteria, or would require a demonstration of fault. The actual substantive language employed in the agreement reflects the consistent determination to impose a no-fault obligation to repair and rehabilitate.

In a May 29, 1998 Project Description, the Project's sponsors explained: "We plan to combine material technology and know-how with an economically disciplined approach to pavement management to minimize Koch's warranty costs over the 20-year coverage of the SR-44 project." They attached a Summary of Maintenance Expenditures, with an "Expected Case" and a "Downside Case." In the Expected Case, Koch estimated that the "Nominal Warranty Costs" over a twenty-year period would total $40,942,242, with a net present value of the costs totaling $21,262,502. In almost half of the years, the only "Maintenance Expected to be Performed" was monitoring. In year 2009, Koch estimated that it would incur warranty costs of more than $5 million for a 2-inch mill and overlay of 10 % of the pavement, as well as fog sealing the remaining 90 % of the pavement. Koch predicted that the bulk of the warranty costs would occur in year 2017, with more than $26 million for, among other costs, a two-inch mill and overlay of 20% of the pavement and surface treatment of the remaining 80 % of the pavement. (Karpoff Decl. Exh. 22).

The SR 44 Project was discussed at several of Koch's Board meetings. Mickey Hines, Koch Materials engineer, attended one such Board meeting. Asked whether the Project would be "like the Golden Gate Bridge where by the time they start painting one end of it and get to the other, they just turn around and do it all over again so you're constantly painting it," Hines told the Board "that we would have work to do – we believed that we would have some work to do every year. We'd be monitoring the road and trying to identify problems and correct them as soon as we could and we believed that by being as proactive as we could be, that we could reduce the amount of work on the road." (Hines dep. at 120-121).

Nothing in the extensive documentary history presented by the United States contradicts the facts otherwise established and identified herein – that none of the parties associated with the negotiations for the Agreement used the term "Warranty" in its standard legal sense. Rather, the evidence is consistent and uncontradicted that the term was used for political purposes in New Mexico. The term was included at the request of New Mexico State officials for political and public relations reasons. The term "Warranty" was adopted by the State before its Request for Proposals was issued. All of the witnesses are consistent on the question, and there is no evidence contradicting their statements concerning the parties' intentions.

**Additional Facts**

As additional facts in response to Koch's motion for summary judgment, the United States points to four additional communications by the plaintiff as supportive of its position, three of these involving messages sent by Heitmann, as well as a 1990 FHWA policy governing special construction funding.

In an e-mail to Heitmann, dated February 16, 2001, Dale Gooch, the Tax Director of Koch Materials Group, suggested language to insert in correspondence to the New Mexico Transportation Secretary "to have the potential desired tax effect upon audit."

> I have put certain words or phrases in bold that really should be part of whatever document you send to NM because these buzzwords would show the IRS the essence

32

of our <u>construction obligation</u>. I am attempting to recast the maintenance activity as being more of "light" construction activity so that it may also be shown as *incident to and necessary* as related to the secondary reconstruction activities. If we are successful at doing that, we may be able to include the maintenance revenues & costs in the LTC method along with the secondary reconstruction revenues & costs.

(Def. Resp. Exh. F) (emphasis in original).

The government next cites a letter written by Heitmann to the editor of the *Albuquerque Journal* on December 15, 1999, taking issue with the Journal's coverage of the NM 44 project. Heitmann pointed out in his letter that the General Counsel for the SHTD was involved in every step of the process, and that he was in frequent communication with the State's Attorney General's Office. Heitmann defended the Performance Roads warranty: "A warranty will provide New Mexico with a higher quality product for a lower total price. Highway maintenance is very expensive. Yet, the warranty price is significantly lower that SHTD's history maintenance costs." (Def. Resp. Exh. G).

Mr. Heitmann also wrote a letter to Brian Deery of the Associated General Contractors of America commenting on the draft of a white paper Mr. Deery prepared on long term warranties. Heitmann wrote: "Since Koch Materials Company is in the business of providing long term warranties on several projects, we must take issue with several points raised in your paper." Under the Koch materials model, he continued:

Because the contractor is made to be responsible for those future maintenance and rehabilitation costs through a warranty, he will have the incentive to choose the combination that minimizes those resources over the life of the road. Thus, a warranty is not so fairly characterized as a "cost of covering risk" as so charged in the white paper, but is more properly viewed as a mechanism that encourages greater allocation of resources at initial construction in order to minimize or avoid altogether resources that would otherwise be spent on maintenance during the life of the road.

In response to Deery's prediction that warranties will spell the demise of small contractors, Heitmann countered:

It is important to note that Mesa itself is doing no construction work on the project. All paving work is being performed by traditional paving contractors who are contracted directly to the State, and special efforts have been made to encourage local contractors to bid the work.

(Def. Resp. Exh. H).

Finally, the United States notes that on February 13, 1990, FHWA's Special Experimental Project No 14 (SEP-14) "Innovative Contracting" was initiated, as a result of recommendations from a Transportation Research Board (TRB) task force formed to explore innovative contracting practices. Since 1990, the FHWA has allowed the State DOTs to evaluate non-traditional contracting techniques which are competitive in nature but do not fully comply with the requirements in Title 23 United State Code. Federal-aid construction contracts that utilize a method of award other than the lowest responsive bid must be evaluated under SEP-14. The non-traditional practices originally approved for evaluation were: cost-plus-time bidding, lane rental, design-build contracting, and warranty clauses.

The additional facts the United States cites do not alter the essential nature of the facts otherwise established in the case, specifically, that under the agreements it was a virtual certainty that extensive reconstruction and rehabilitation would be required, and that Koch would operate as a general contractor overseeing those repairs. The February 16, 2001 email only shows that the company, facing a likely audit, was trying to position itself favorably. In fact, the email is wholly consistent with the understanding that Koch was responsible for construction costs during the Rehabilitation Phase. Similarly, nothing in the letter by Heitmann to the *Albuquerque Journal* is inconsistent with the understanding of all of the parties associated with the Agreement that it was virtually certain that Mesa would be required to expend extensive sums during the Rehabilitation Period. The letter to Deery is consistent with the parties' general usage of the term "maintenance" in a colloquial sense to include repair and rehabilitation costs, and that the fact that Mesa was responsible for all such work done by local New Mexico subcontractors. And while the FHWA has encouraged "innovative contracting," it also remains true that the FHWA will not approve such innovation where it contradicts federal statutes. (Def. Res. Exh. I., at 1-2).

Koch received total Warranty compensation of $59 million in 2000 and 2001. Treating the income it received during the years 1998 through 2001 under the Agreement as income for a long-term contract under IRC § 460, Koch reported $0 in income from the project for 1998,

34

$1,814,384 for 1999, $1,578,653 for 2000, and ($1,953,698) for 2001 on its consolidated federal income tax returns. The IRS later concluded that the income could not be properly treated as coming from a long-term contract, and issued Koch a notice of deficiency. Koch paid the additional tax and filed claims for refund on September 26, 2005. The IRS has disallowed the claims.

**Conclusions of Law**

Section 460 provides an exception to the general rule for income under long-term contracts, permitting the taxpayer to claim income of the duration of the contract by proportionally matching the income to expenses over the duration of the contract, rather at the time of the original receipt of the income.  In this context, a long-term contract "generally is any contract for the manufacture, building, installation, or construction of property if such contract is not completed within the taxable year in which such contract is entered into." IRC § 460(f)(1).  See Treas. Reg. § 1.460-1(b)(1); I.R.S. Notice 89-15, 1989-1 C.B. 634, Q&A 1 (Jan. 12, 1989).  Treas. Reg. § 1.460-1(b)(2)(I) provides an express definition for construction contacts within the meaning of Section 460:

> A contract is *a contract for the manufacture, building, installation, or construction of property* if the manufacture, building, installation, or construction of property is necessary for the taxpayer's contractual obligations to be fulfilled and if the manufacture, building, installation, or construction of that property has not been completed when the parties enter into the contract. .... Furthermore, how the parties characterize their agreement (*e.g.*, as a contract for the sale of property) is not relevant.

(Emphasis in original). The IRS has concluded that a contract is long term if it "involves the building, construction, reconstruction, or rehabilitation of real property; the installation of an integral component to real property; or the improvement of real property." Treas. Reg. § 1.460-3(a). The purpose underlying PCM is the difficulty of determining profitability in the face of fluctuating future costs.  *United States v. Howard*, 855, F.2d 832 (11th Cir. 1988).

The uncontroverted facts establish that it is virtually certain that Koch will have substantial future construction expenses during the Rehabilitation Phase, running into the millions of dollars,

but that the precise amount of these expenditures cannot be known for a variety of reasons, including variations in the price of materials. Under Treas. Reg. § 1.460-3(a), the rehabilitation of roadways is explicitly acknowledged as construction.  Further, it is uncontroverted that the FHWA, which may expend federal funds for construction projects and not for routine maintenance, was closely involved in the New Mexico highway project. The FHWA viewed the agreement as requiring future construction efforts by Koch, and ultimately approved the project.

In support of its argument, Koch cites a variety of cases, including *Exchange Sec. Bank v. United States*, 345 F. Supp. 486 (N.D. Ala. 1972), *rev'd on other grounds*, 492 F.2d 1096 (5th Cir. 1974), for the proposition that the courts have accepted that an event virtually certain to occur should be treated as if it will occur. The government correctly notes that this case is not directly on point, since it applied the principle of virtual certainty to the timing of the realization of income, and not the statutory categorization of income.

But the general principle reflected in the case remains applicable here, and, significantly, the government presents no authority in support of the opposite conclusion – that the court should ignore uncontroverted evidence that the plaintiff is virtually certain to expend millions of dollars for road construction over several decades.  It is true that the exact timing and amount of such expenditures are uncertain, but that is the underlying purpose for the percentage of completion method – to allow appropriate matching of income against future expenses which are uncertain due, for example, to changing costs for future materials.  See Rev. Rul. 70-67, 1970-1 C.B. 117.

The government contends that the plaintiff cannot use PCM because Koch was not the designated "general contractor" of the project for the Rehabilitation Period work, but that work was instead actually performed by other companies who directly contracted with the State of New Mexico.  The court finds that Koch is entitled to the provisions of Section 460 even though it did not directly perform any construction work. The IRS has previously taken the position that such obligations as those performed by Koch fall within those of a general contractor.

36

Under a Coordinated Issue Paper, the IRS articulated a distinction between general contractors (which can use PCM), and construction management (CM) firms (which cannot), stating that "[t]o distinguish between a construction contract and a CM contract, it must be determined whether the activities performed are in the nature of personal services or are those of a general contractor." IRS, Coordinated Issue Paper, Construction/Real Estate Industry, *Construction Management Contracts* § 1 (Apr. 17, 1995) (here, "CIP"). A general contractor typically controls the work and bears the cost risks of failure; a CM acts as an agent for the owner and is not liable for construction defects.   The CIP notes that "[l]arge scale contractors *typically* engage in actual construction activities." Id. (emphasis added). More fundamentally, "[a] general contractor contracts with an owner to be responsible for all of the construction work necessary to complete a project, even though subcontractors may be used to perform part or all of the work." *Id.*

Here, Koch meets this definition.  It was fully responsible for the final constructed product, controlled the work of the contractors, and bears the entire expense for the Rehabilitation Period construction – even if the expense exceeds the amount of its income from the project. Koch determined all aspects of the work to be performed.  To meet its obligations, it was required to post a bond in the full amount of its potential liability. The court finds that Pavement and Structures Warranties are construction contracts within the meaning of Section 460, and that Koch is entitled to report its income by PCM.  The government's reliance on pre-Section 460 case law (citing a series of 1920s era road construction cases as well as cases such as *RCA Corp. v. United States*, 664 F.2d 881 (2d Cir. 1981), which involved service contracts rather than construction) does not alter this result.

However, an additional question remains. Are Koch's obligations under the Agreement "warranties" within the meaning of Section 460?  PCM treatment is not available for income for "warranties" under Treas. Reg. § 1.460-1(d)(2). This is the crux of the government's argument: that the income in question here is not eligible for Section 460 treatment.  The court finds that the government's argument does not bar PCM treatment of Koch's income under the Pavement and

Structures Warranties. The regulations do not independently define the term "warranties," but the structure of the exclusion gives an important understanding of the nature of the exclusion.  Under § 1.460-1(d)(1), the regulations focus on whether the contract is incidental to a long-term contract:

> Gross receipts and costs attributable to non-long-term contract activities (as defined in paragraph (d)(2) of this section) generally must be taken into account using a permissible method of accounting other than a long-term contract method. See section 446(c) and § 1.446-1(c). However, if the performance of a non-long-term contract activity is incident to or necessary for the manufacture, building, installation, or construction of the subject matter of one or more of the taxpayer's long-term contracts, the gross receipts and costs attributable to that activity must be allocated to the long-term contract(s) benefitted as provided in §§ 1.460-4(b)(4)(I) and 1.460-5(f)(2), respectively.

The regulations then further specify in the following paragraph:

> Non-long-term contract activity means the performance of an activity other than manufacturing, building, installation, or construction, such as the provision of architectural, design, engineering, and construction management services, and the development or implementation of computer software. In addition, performance under a guaranty, warranty, or maintenance agreement is a non-long-term contract activity that is never incident to or necessary for the manufacture or construction of property under a long-term contract.

Treas. Reg. 1.460-1(d)(2).

The term "warranty" used in the regulations should be understood in the context of the regulation's focus on the relationship of the contract activity to the construction obligation, and indeed reflects the historical understanding of "warranty" as "'an affirmation of the quality or condition of the thing sold (not uttered as matter of opinion or belief) made by the seller at the time of sale, for the purpose of assuring the buyer of the truth of the facts affirmed, and inducing him to make the purchase.'" *Shippen v. Bowen*, 122 U.S. 575, 581 (1887) (*quoting Osgood v. Lewis*, 2 H. & G. 495, 518 (Md. 1829)).

Here, the "Warranties" bear none of the hallmarks of traditional warranty as being merely incidental to the underlying obligation.  Rather, the uncontroverted evidence establishes that the Pavement and Structures Warranties were the subject of separate and extensive negotiation, creating significant obligations for Koch/Mesa over the lifetime of the contract which were: (1) virtually certain to occur; (2) which were not dependent on any showing of defect; and (3) which were paid

for separately by the State of New Mexico.  See P.L.R. 8349028 (Aug. 31, 1983) ("[w]arranty liability can be properly viewed as liability arising out of a breach of the initial sales contract to furnish a sound product").

The government argues that Koch, having used the term "Warranty" in the Agreement, cannot not claim that its Agreement with New Mexico was anything other than a warranty.  In support of what is essentially an estoppel argument, the United States notes language in a footnote in decision by the Pennsylvania Supreme Court, the court observing:  "Appellee never explicitly argues that the document is not a warranty. Indeed, having drafted the document and labeled it a warranty, Appellee would be hard pressed to so argue." *Nationwide Insurance Co. v. General Motors Corp.*, 533 Pa. 423, 625 A.2d 1172, 1177 n.9 (1993). The cited decision was an action for breach of warranty arising from a consumer purchase of an automobile, and the court explicitly expressed concern with the consumer nature of the transaction.  *See* 625 A.2d at 1177-78 ("we will not permit Appellee and other sellers who draft similar documents to escape the consequences of presenting them to the consumer").  The case would therefore have limited application here where all the parties to the Agreement were experienced and sophisticated, and all agreed that the substance of the transaction was not a traditional warranty.

The government cites no further authority for this estoppel argument, which is further contradicted by the government's recognition elsewhere that Koch is not absolutely bound by the labels used in the contract. It its Brief, the United States stresses that "a taxpayer may not disavow the form of an agreement that it freely entered into *in the absence of 'strong proof' that the parties intended a different arrangement*" Dkt. No. 88 at 26 (emphasis added). The requirement for "strong proof" is addressed separately herein; for present purposes, it is sufficient to note and agree with the government's position that the form of the agreement is not absolutely controlling of the outcome of the case. The IRS has explicitly concluded that, for purposes of determining whether an agreement is a long-term contract under Section 460, "how the parties characterize their agreement ... is not relevant."  Treas. Reg. 1.460-1(b)(2)(ii).  Thus, the label is not only not *controlling*, it is not even

*relevant*.  The focus of the court must be on the substance and actual obligations of the parties' agreement.

The government also argues that Koch cannot contend that the provisions are not true warranties, as this would violate the parol evidence rule.  That rule generally applies in actions between the parties to an agreement, and prevents one party from using prior oral communications to vary the terms of a written agreement.  However, in an action involving a "stranger to the [contract], parol evidence  may be considered." *Megatech, Inc. v. NSD Acquistions, LP*, No. 99-2344, 2000 WL 718392, * 3 (4th Cir. June 5, 2000) (applying Virgina and Pennsylvania law).  The Tenth Circuit has observed that "the parol evidence rule is ordinarily applied only to issues between the parties to the contract and not to third parties." *Greta West Cas. Co. v. Truck Ins. Exch*., 358 F.2d 883, 885 (10th Cir. 1966).

This limitation on the rule has been explicitly recognized in tax cases.  Thus, in *Stern v. Comm'r of Internal Revenue*, 137 F.2d 43, 46 (2d Cir. 1943), the court ruled that "the parol evidence rule only excludes proof varying a written instrument, where the issues are between the parties to it, and does not affect the right of the Commissioner, who was not a party, to go behind the written contract in order to discover the true facts."

> It is well settled that the rule against varying or contradicting writings by parol evidence obtains only in actions between the parties thereto and their privies. We have many times held that parol evidence is competent and admissible to modify or explain the terms of a written instrument involved in a tax proceeding, where the Commissioner is neither a party nor a privy to the instrument.

*Pickrell & Craig Co. v. Comm'r of Internal Revenue*, 1938 WL 8207 (B.T.A.), B.T.A.M. (P-H) P 38,145 (1938) (citing cases).

The court finds that the parol evidence rule has no application here.  Even if it did, it would not alter the result.  It is apparent that Koch is not attempting to contradict or alter the terms of the Performance and Service Warranties.  Rather, its evidence reflects an attempt to define what the label "Warranty" means within the terms of the Agreement.  The evidence of how Koch and New Mexico understood the Agreement is consistent with the obligations of those parties as spelled out in the

operative written language of the Agreement. Both the written agreement and the understanding of Koch and New Mexico are consistent – Koch would be responsible for significant construction work during the Rehabilitation Period.  The uncontrovered evidence establishes that Koch was given obligations for future construction under the Agreement, and this, rather than the label "Warranty," is the essential matter here.

The government argues that the Pavement and Structures Warranties fall within a form of agreement in modern business practice, a performance warranty.  Citing a variety of non-case authorities but particularly Bruner and O'Connor, *Construction Law,* § 9:20 (2002), the United States stresses that performance warranties are increasingly used in commercial practices, and that the warranties for the highway construction here are examples of such provisions.  The court finds that the argument fails to justify a different analysis or result.  A performance warranty is an agreement which supplies explicit criteria for determining the existence of actual or latent defects. *See* McBride & Touhey, *Government Contracts Cyclopedic Guide to Law*, *Administration, Procedure,* § 27A.40[3][a] (2006 ed.).

Performance warranties are therefore not some wholly new species of agreement, but a variation in the familiar animal; the focus remains on the buyer's ability to correct unexpected defects.  The obligations of Koch in the present case far exceed those of any standard or performance warranty.  Under the Agreements, Koch was required as a near certainty to spend millions of dollars during the term of Rehabilitation Period for reconstruction and rehabilitation of the highway.  This obligation existed wholly independent of any showing of defect.  Indeed, the certainty of such remediation and expenditures was no surprise to either Koch or the State of New Mexico; both parties actively expected that such actions would be required on a substantial scale. The government has identified no similar agreement – an obligation across two decades to rehabilitate a major highway to specified criteria, irrespective of defect – being treated as warranty; indeed, it is uncontroverted that the present Agreement was innovative and the first of its kind for a major highway construction project.

Just as the provider of what is in essence a traditional warranty would not be allowed to use PCM merely because it tacked the term "Construction Contract" onto the top of its agreement, so the mere fact that Koch and the State of New Mexico used the label "warranty" for purposes of salesmanship should not obscure the fact that the Agreement in reality created, and was understood to create, almost certain, extensive and long term construction obligations on the part of Koch.

Finally, the government stresses that Koch's interpretation of the contract should be rejected pursuant to a "strong proof" rule, citing cases holding that a taxpayer may not disavow the form of an agreement that it freely entered into in the absence of strong proof that the parties intended a different arrangement. *See Guaderrama v. Comm'r*, 21 Fed. Appx. 858, 861 (10th Cir. 2001); *Kreider v. Comm'r*, 762 F.2d 580, 586 (7th Cir. 1985) (taxpayer seeking to attack form of agreement must present "strong proof" showing that intent of parties was other than that expressed in agreement); *Hamlin's Trust v. Comm'r*, 209 F.2d 761, 765 (10th Cir. 1954) (parties transacting at arm's length cannot later attempt to avoid tax consequences by claiming that substance of transaction differed from its form).

The court finds that the "strong proof" should not be required here.  First, in the cases cited, the parties to the agreement had divergent interests in how an agreement was characterized for tax purposes.  Faced with competing interests between form and substance, courts have recognized the burden is on the party to an agreement attempting to give priority to first over the second. The rule has little point where both of the parties share the same interpretation of the agreement.  More importantly, the requirement of strong proof is here effectively displaced by Treas. Reg. 1.460-1(b)(2)(ii) which explicitly provides that "how the parties characterize their agreement ... is not relevant." Thus, for purposes of applying Section 460 the court always focuses only on the substance of the agreement, since its form is irrelevant.

Even if the court were to apply a "strong proof" requirement, that standard would be easily met in the present action.  The uncontroverted evidence establishes that both parties to the Agreement understood the duties created for Koch, that those duties would include much more than

42

any standard warranty.  As noted several times in this opinion, both parties used that term for political purposes only. Both the operative language in the Agreement and the parties' expectations were in accord:  Koch would be required to provide construction work on the highway for over two decades.

In conclusion, the court finds that the Pavement and Structures Warranties were not the sort of tacked-on provision providing assurance to the uncertain buyer that a product will be free of unanticipated defect, as is emblematic of the traditional warranty. Instead, these provisions were separately negotiated and separately priced.  They created the virtual certainty that Koch would have to spend millions of dollars for road construction work over two decades.  Both Koch and the State of New Mexico knew such extensive construction work would happen. The Agreement created this obligation to perform the construction without regard to any proof of defect.  While the parties actively and extensively negotiated the contents and details of those obligations, the parties never actively negotiated the label "Warranty" which was attached to the document.  The FHWA viewed the project as one for construction, and so funded the project.  The Agreement is unique in its combination of mandatory rehabilitation to achieve specified criteria, regardless of defect, with a duration of twenty years. The Agreement squarely falls within the purpose of Section 460, which is to match income from long-term construction contracts against future expenses, given the uncertainty of the amount or timing of the future costs.

IT IS ACCORDINGLY ORDERED this 10th day of July, 2008, that the plaintiff's Motion for Summary Judgment (Dkt. No. 85) is granted; that of the defendant (Dkt. No. 87) is denied; the plaintiff's Motion to Strike (Dkt. No. 110) is granted in part as provided herein.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE